[Civ. No. 624.   Fifth Dist.   Aug. 15, 1966.]

Estate of VIOLA M. STRONG, Deceased. LORIS M. HOWICH, Claimant and Appellant, v. DIANE MARIE WILLIAMS et al., Claimants and Respondents.

Don Lake for Claimant and Appellant.

Badger & Mower, James P. Mower and David G. Dunford for Claimants and Respondents.

STONE, J.—Appellant, a brother of the testatrix, appeals from a decree determining heirship which confirmed a devise to claimant-respondent, whom testatrix described in her will as "surviving issue of my son, a daughter, Diane Marie Hicks,

who was born out of wedlock to Marie Hicks, of Williams, Arizona.''

Donald Frank Gilman, son of the testatrix, Viola M. Strong, was taking pilot training near Phoenix, Arizona, in 1942, when he met Marie Hicks, who was estranged from her husband, Marrel Hicks, a soldier stationed at San Bernardino, California. They began ''going together'' and several times engaged in sexual intercourse commencing some time prior to November 1942 when Mrs. Hicks discovered she was pregnant. In April 1943, Mrs. Strong traveled from California to Thunderbird Field in Arizona to attend Donald's graduation exercises. Donald introduced his mother to the obviously pregnant Mrs. Hicks. After graduation, Donald was transferred to another flying field for advance training; eventually he was sent overseas and was reported killed in action during 1944.

In April 1945, when Diane was approximately 18 months old, Mrs. Strong went to Phoenix, Arizona, visited Diane and Mrs. Hicks, and persuaded them to return with her to Coalinga. They lived in the household with Mr. and Mrs. Strong. Mrs. Hicks worked for the telephone company, and Mrs. Strong took care of the child. Difficulties ensued because Mrs. Strong wanted to adopt the baby, to whom she had become attached, and Mrs. Hicks felt the only way trouble could be avoided was to leave with the child. This she did after some three months, and it appears that Mrs. Strong never again saw Diane.

Some time later, Marie Hicks married a man named Chamberlain and was living with him when this action was brought. The Chamberlains gave Diane the name of her foster father, so that all of the children were known by the name Chamberlain. Diane attended school, and married, thinking Chamberlain was her surname.

The will of Viola M. Strong, executed September 8, 1945, contained the following provisions: ''SECOND: The following are my legal heirs: My husband, Wade Mitchell Strong and my only son, Donald Frank Gilman, who has been in military service and has been reported missing, but in the event he is now deceased, there is living, as surviving issue of my son, a daughter, Diane Marie Hicks, who was born out of wedlock to Marie Hicks, of Williams, Arizona.

''. . . . . . . . . . . . . .

''FOURTH: I give, devise and bequeath unto my said son, Donald Frank Gilman, all of my property, both real and personal, of which I die possessed, and which I may be [sic] WILL so give, devise and bequeath. FIFTH: But should my said son not survive me, then I give, devise and bequeath all of my

estate, real and personal, wherever situated, hereinafter termed the trust estate, to Dorothy Musser, in trust, to hold, manage and distribute as hereinafter provided. (a) The net income shall be distributed in monthly or other convenient installments to, or for the benefit of, the said daughter of my son, to-wit: Diane Marie Hicks, beginning upon the date of distribution to said trustee, Dorothy Musser, until distributed, by her, to such child . . . ."

As we have noted, after Mrs. Hicks took Diane from Coalinga, the testatrix never saw them again. Yet some 18 years after executing her will, the pertinent parts of which are hereinabove set forth, she wrote the following codicil in letter form, which was admitted to probate along with her formal will. It reads: "Dear Dorothy: Thot I'd better write a line in case anything happens to me. Haven't felt very well for a long time. At the best its a lonely life and since the President's *assina*tion, it seems the world and the country has fallen apart. Me included. As you know you are still executrix of my will. It is in my safe in the closet. I don't think Dian will be hard to locate, if she is still alive. Her birth was registered in Phoenix Aug. 31, 1942. All information is in letters in my cedar chest. I have decided I want to be cre*am*eated and put in Franks grave as I am sure the body I bu*rr*ied is not Dons. I don't want any funeral just put quietly to rest. A priest preferred. In case Dian isn't alive, I want my youngest brother, Lorry M. Howick 3505 E. Calif. St. Pasadena 10 Calif. to have everything. Only $1.00 each to my other brother and sister. Of course you will get your percentage. All my bills are paid. Income tax taken care of. The duplex is paid for. Only owe $4000.00 on other building. There is over that amount in savings and checking acc'ts. All books and acc'ts in top right drawer of desk. Gosh I'd like to talk to you. Thanks a lot for everything you will have to do. Love Vi. Strong"

Appellant asserts the only conclusion that can be drawn from the evidence is that testatrix intended to leave her property to Diane Marie Hicks, not as an individual, but as her grandchild. Therefore, he argues, there is no evidence to support the finding that "testatrix intended to leave all of her estate by will to Diane Marie Williams in the event that Donald Frank Gilman did not survive the testatrix." Using the same premise, he reasons that the finding "From the evidence it is not certain who is the father of Diane Marie Hicks, presently known as Diane Marie Williams," defeats rather

than supports the first finding. Further, asserts appellant, the court was required to find ''who was the father of Diane,'' that ''Diane is not the daughter of Donald'' and that ''Donald is not the father of Diane.''

Whether the decree will stand rests upon whether there is substantial evidence to support the finding that testatrix intended unconditionally to leave her property to Diane as an individual.

At the outset, we note that an appeal in an heirship proceeding is governed by the well established rule that where a reasonable inference can be drawn from the evidence to sustain the findings of the trial court, the findings will be upheld. (*Estate of Walden,* 166 Cal. 446 [137 P. 35]; *Estate of Cavner,* 165 Cal.App.2d 260 [331 P.2d 781]; *Estate of Rivolo,* 194 Cal.App.2d 773 [15 Cal.Rptr. 268].)

It is important to keep in mind, also, that the interpretation of a will is limited to an ascertainment of the intention of the maker as disclosed by the language used therein. (*Estate of Sandersfeld,* 187 Cal.App.2d 14, 19 [9 Cal.Rptr. 447], and cases cited therein.) Although where a latent ambiguity exists extrinsic evidence is admissible as an aid to interpreting the language of a will, extrinsic evidence may not be used to show a different intent from that disclosed by the language of the will. (*Estate of Sandersfeld, supra; Estate of Buzza,* 194 Cal.App.2d 598, 601 [15 Cal.Rptr. 518].)

Certainly it is not the function of a court to determine who in the normal course of events *should be* the objects of the testatrix's bounty, but, rather, to determine who the testatrix did, in fact, intend to make the object of her bounty. It is not the province of the trial court or a reviewing court to remake the will.

Extrinsic evidence is admitted for the purpose of clarifying uncertainty (*Estate of Buzza, supra*); for example, here, had there been a controversy as to the identity of Diane Marie Hicks, extrinsic evidence would be admissible to clarify any such ambiguity and to identify the beneficiary. But no such ambiguity appears on the face of the will; the testatrix was not at all uncertain as to whom she was leaving her property. Appellant says there is an uncertainty of a different kind, in that the devise was conditioned upon consanguinity to Diane. Such a condition would have to be read into the will and the codicil by the court because it does not appear on the face of either document. We believe the trial court was correct in refusing to infer such a condition.

The testatrix knew the facts surrounding Diane's birth; there is not the remotest suggestion in the record that Mrs. Hicks, Donald Gilman, Diane, or anyone else did or said anything to mislead her. To the contrary, the son introduced Mrs. Hicks to his mother at graduation, he told her they had been going together, that Mrs. Hicks was separated from her husband; it was obvious that Mrs. Hicks was pregnant. After her son went overseas, the testatrix, with full knowledge of the facts, made a trip at her own expense from Coalinga, California, to Phoenix, Arizona, to get Mrs. Hicks and the child. At her own expense she brought them to Coalinga, and took them into her home where she would have kept them indefinitely had not Mrs. Hicks become upset because of the attachment testatrix developed for the child. Yet, despite changes in her plans because of the dissension and Mrs. Hicks' flight with the child, some months after the departure of mother and child, testatrix consulted her attorney and executed the formal will which we have heretofore quoted in pertinent part.

Perhaps it is even more impressive that after an 18-year interval, with ample opportunity to think over the events that led her to make the original will, testatrix wrote a holographic codicil reiterating her wish to leave her estate to Diane ''if she is still alive,'' this even though she had not seen the child during the entire period.

The testatrix was not an uninformed, naive woman, beguiled by Marie Hicks or Diane or anyone else. In her will she frankly said that the child was born to Marie Hicks and her son out of wedlock. She told her friends that Marie Hicks was married to a man other than her son but that she had separated from her husband before her son met her. Thus, testatrix knew something of the probabilities surrounding her son's fatherhood resulting from his association with a married woman. With all this before her, she left her property to Diane, and 18 years later by a codicil placed her imprimatur upon the original devise.

From our review of the record, we are far from convinced that Donald was not the father of Diane; at most, appellant raises an uncertainty as to the beneficiary's father. An uncertainty of the nature shown here does not justify setting aside a devise made in a will and confirmed 18 years later by a codicil. Even a demonstrated mistaken belief, which is much stronger than an uncertainty, does not necessarily vitiate a devise. The general rule governing the effect of a testator's mistaken belief concerning his relationship to a benefi-

ciary is found in 57 Am.Jur., Wills, section 380. It is said, at page 275, that: "The mistake of the testator as to the status of a beneficiary or his relationship to the beneficiary, which is not the result of any fraud, concealment, or suppression of facts by the beneficiary, is not a ground for defeating the bequest on probate, at least if it appears that the supposed status or relationship was not the sole motive for the bequest."

The foregoing rule is complemented by the somewhat broader public policy enunciated in *In re Gluckman's Will*, 87 N.J.Eq. 638, 641 [101 A. 295, 296, L.R.A. 1918D 742]: ". . . it is against sound public policy to permit a pure mistake to defeat the duly solemnized and completely competent testamentary act. It is more important that the probate of the wills of dead people be effectively shielded from the attacks of a multitude of fictitious mistakes than that it be purged of wills containing a few real ones. The latter a testator may, by due care, avoid in his lifetime. Against the former he would be helpless."

Respondents point out that the codicil leaves $1.00 each to the other brother and sister of testatrix and the remainder of the estate to appellant only "in case Dian isn't alive." Since Diane is alive, to set aside the devise and bequest to her upon the ground of mistake would result in intestacy. ▇ We are reminded that wills should be interpreted with a view to preventing intestacies as to any portion of the estate. (Prob. Code, § 102; *Estate of Rollins*, 163 Cal.App.2d 225, 227 [328 P.2d 1005].) Although we are inclined to view this as a "make weight" argument in support of the trial court's findings, it was held, in *Estate of Meininger*, 237 Cal.App.2d 102, at page 105 [46 Cal.Rptr. 609]: "When a decedent leaves a will, the implication arises that intestacy was not intended. [Citations.] A presumption is raised that the testator intended to dispose of all his property, and this presumption is much strengthened if a residuary clause is included. [Citation.] Such clauses are to receive a liberal interpretation so as to avoid intestacy of any part of the testator's estate. [Citations.] And generally, whenever a testamentary provision can be construed to have either of two meanings, the meaning should be given it which will prevent intestacy."

The judgment is affirmed.

Conley, P. J., and McMurray, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.